FILED
DEC 23 2003
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ______
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES CLAYWORTH, R.Ph., doing business under the fictitious name and style of Clayworth Healthcare Pharmacy; WAYNE ROBERTS, and MADELEINE MADDEN,
Plaintiffs,

v.

DIANA M. BONTA, Director of the Department of Health Services, State of California, and DEPARTMENT OF HEALTH SERVICES, a department of the State of California,
Defendants.

CIV-S-03-2110 DFL/PAN
CIV-S-03-2336 DFL/PAN

MEMORANDUM OF OPINION AND ORDER

CALIFORNIA MEDICAL ASSOCIATION, et al.,
Plaintiffs,

v.

DIANA M. BONTA, Director of the Department of Health Services, State of California,
Defendant.

Medi-Cal providers and beneficiaries challenge the State of California's impending 5% reduction in the reimbursement rate paid to providers. Plaintiffs contend that the rate reduction violates the Medicaid statute, particularly the quality of care and equal access provisions, and they seek a preliminary injunction preventing defendant Diana Bonta, the Director of the California Department of Health Services, from implementing the rate reduction when it is scheduled to go into effect on January 1, 2004.

The case presents two sorts of issues. First, the court must decide whether plaintiffs have standing and whether Congress has given them a cause of action under 42 U.S.C. § 1983 to enforce certain provisions of the Medicaid statute. The court concludes that Medi-Cal beneficiaries have both standing and a cause of action and that Medi-Cal providers have third party standing to assert claims on behalf of beneficiaries concerning fee-for-service rates. However, the court does not find that either beneficiaries or providers have a claim under § 1983 to enforce the provisions in the Medicaid statute relating to managed care plans. Those statutory provisions are addressed to the Secretary of Health and Human Services, are designed to reduce the State's costs, and do not unequivocally confer rights on either providers or beneficiaries. Furthermore, because managed care providers are contractually bound to provide adequate services to Medi-Cal beneficiaries, beneficiaries in managed care plans should not be adversely affected by the rate

cut. As will be explained, there are other avenues available to managed care providers to protest the rate cut.

Second, the court must decide whether the across-the-board 5% rate cut, which was enacted by the California legislature, violates the quality and equal access requirements of the Medicaid Act. Under binding Ninth Circuit law, the Medicaid statute grants a right to beneficiaries to a rate setting decision by the State that is not arbitrary and that takes into account provider costs, quality of service, and equal access to medical services for Medi-Cal recipients. See Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1500 (9th Cir. 1997). Where the administrative record reveals a considered decision by the Department of Health Services that a certain rate is consistent with the requirements of the Medicaid Act and the approved State plan, the court will review that decision with deference. Given the complexity of the Medi-Cal system, deference to the expertise of the Department of Health Services is not only appropriate, it is virtually a necessity. However, in this case, there is no record of considered decisionmaking. There is no evidence that the Director recommended the rate reduction, that the State legislature ever sought the recommendation of the Director, or that any responsible official in State government made a determination that the pending rate reduction is consistent with quality care and equal access in light of provider costs. Thus, as to this rate reduction, there is no considered decisionmaking process that the court may review. The decision to cut fee-for-

service rates across the board without analyzing the effect on services to beneficiaries is arbitrary and violates federal law. Accordingly, the court finds that the preliminary injunction should issue as to the non-managed care, fee-for-service reimbursement rates affected by the pending 5% rate reduction.

There are undoubtedly many ways in which the Director may reduce overall Medi-Cal costs. For example, some of the medical services provided by Medi-Cal are optional in the sense that they are not required by the Medicaid statute. A decision to cut these services from Medi-Cal would not implicate federal law even though the decision could leave some beneficiaries without coverage for medical care that few would consider "optional" in the normal sense of the term. But when the decision involves a cut to a reimbursement rate for a service that the State either must or has elected to include within Medi-Cal, federal law requires that the decision be based on a considered finding that in light of provider costs the rate reduction will not affect the quality of service afforded to beneficiaries or their equal access to such medical service.

## I. Facts and Procedural History

### A. The Federal Medicaid Program

Medicaid is a federal program that distributes funds to states in order to provide health care services for poor persons who are aged, blind, disabled, or members of families with dependent children. 42 U.S.C. §§ 1396a-1396v. The program is jointly funded by the federal and state governments and is

administered by the states. The states determine eligibility, the types of services covered, payment levels for services, and other aspects of administration, within the confines of federal law. See Orthopaedic Hosp., 103 F.3d at 1493. Federal law requires participating states to provide a basic array of services and allows states to provide certain additional optional services, such as dental care, if they so choose. 42 U.S.C. § 1396a(a)(10); Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170, 173 (3d Cir. 1995).

In order to receive federal funds, a state prepares and submits a state plan, which describes the standards and methods to be used to set reimbursement rates for the services covered. Orthopaedic Hosp., 103 F.3d at 1494. The state plan must be approved by the Secretary of Health and Human Services. The Medicaid Act sets out the requirements of a state plan at 42 U.S.C. § 1396a(a)(1)-(65). The provision central to these two suits is § 1396a(a)(30)(A) ("Section 30(A)"). Section 30(A) requires a state plan to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary. . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

These Section 30(A) standards are referred to as the "efficiency, economy, and quality" requirement and the "equal access" requirement.

The requirements of § 1396a, including Section 30(A), apply to Medicaid programs that operate on the traditional fee-for-service basis. Under this model, a Medicaid recipient may see any enrolled service provider, who is reimbursed directly by the state. 42 U.S.C. § 1395a. However, by way of a waiver from the Secretary of Health and Human Services, states have the alternative of contracting with managed care plans to provide some or all of the covered services in exchange for payment under a prepaid capitation rate or some other risk-based arrangement. 42 U.S.C. § 1396b(m). Under this arrangement, the managed care plans receive predetermined periodic payments in return for providing the required services. Under 42 U.S.C. § 1396b(m)(2)(A)(iii), the rates paid to the managed care plans must be made on an "actuarially sound basis." Under 42 U.S.C. § 1396n(b)(4), the Secretary of Health and Human Services may grant the necessary waivers that permit a state to require Medicaid recipients to receive care through managed care programs, so long as the managed care providers "meet, accept, and comply with the reimbursement, quality, and utilization standards under the State plan, which standards . . . are consistent with access, quality, and efficient and economic provision of covered care and services."

B. The California Medi-Cal Program

California's Medicaid program is known as Medi-Cal. See Cal. Welf. & Inst. Code §§ 14000 et seq. It is administered by the California Department of Health Services. Medi-Cal operates

on both a fee-for-service and managed care basis. California has elected to provide 35 of the 36 available optional services.[1] (Menda Decl. Ex. A, p. 2.) The yearly cost of the Medi-Cal program to the State is $12 billion. The federal government contributes something just over this amount to the State for the operation of Medi-Cal.

California has an extensive regulatory framework for the setting of reimbursement rates. See, e.g., Cal. Welf. & Inst. Code §§ 14075, 14079, 14105. However, on the basis of the record now before the court, it appears that the Department of Health Services does not have any continuous study of rates and their adequacy to meet the Section 30(A) requirements.[2] Nor is there any record that the State legislature - authorized by the State plan to make rate adjustments - has any ongoing study of rates independent of the Department of Health Services.

In January 2003 and again in May 2003, the then-Governor

---

[1] These optional services include: dental care; podiatry; optometry; physical therapy; occupational therapy; speech pathology; audiology; drugs; prosthetic appliances; eyeglasses; diagnostic, screening, preventive, and rehabilitative services; hospice; psychology; certified midwife; medical supplies; hearing aids; acupuncture; and drug addiction treatment and rehabilitation. (Menda Decl. ¶ 4.) In addition, Medi-Cal pays for illegal alien medical services provided by emergency rooms, which is the most expensive way in which to provide medical services that are not actual emergencies. (See Campbell Decl. Ex. D, p. 3.(illegal alien coverage costs $852 million))

[2] According to the Legislative Analyst, the Department has "no rational basis" for its rate system and has not for many years. (Campbell Decl. Ex. D, p. 16.) The rates for various services have been adjusted a number of times over the last 15 years, mostly on an "ad hoc" basis. (Id.)

proposed an across-the-board 15% rate cut in Medi-Cal reimbursement rates as part of his proposed budget. (S. Thompson Decl. ¶ 7.) When the State legislature failed to enact a budget by July 1, 2003 (as required by state law), a compromise budget proposal was negotiated. (Id. ¶ 9.) This proposal, which was ultimately enacted into law, includes a 5% cut in the Medi-Cal reimbursement rate. This rate cut applies across-the-board, though certain services are excepted. The rate cut is codified in Welf. & Inst. Code § 14105.19, as follows:

> (a) Due to the significant state budget deficit projected for the 2003-04 fiscal year, and in order to implement changes in the level of funding for health care services, the Director of Health Services shall reduce provider payments as specified in this section.
> (b)(1) Payments shall be reduced by 5 percent for Medi-Cal program services for dates of service on and after January 1, 2004.

The statute also requires the Department of Health Services to reduce the capitation payments to managed care plans by the "actuarial equivalent" of 5%. Welf. & Inst. Code § 14105.19(b)(3). The actuarial equivalent of the reimbursement rate reduction varies depending on the characteristics of the managed care plan and its members, but the typical reduction is approximately 3%. (See Campbell Decl. Ex. E, pp. 1-3; Tough Decl. ¶ 6.) The rate cut is anticipated to save $245 million in reimbursement costs borne by the State between January 1 and June 30, 2004. (Menda Decl. ¶ 9.)

C. The Parties

The plaintiffs in CIV-S-03-2110 are a pharmacist enrolled as

a Medi-Cal provider and two Medi-Cal recipients.  The plaintiffs in CIV-S-03-2336 are all membership organizations that represent the interests of Medi-Cal providers and recipients.  Only one of these organizations, the Disabled Rights Union, has members who are Medi-Cal recipients.  (See Edmon Decl. ¶¶ 3-4.)  Others, for example, the California Chapter of the American College of Cardiology, have members who are Medi-Cal providers.[3]  (See Watson Decl. ¶ 3.) Two organizations, the Brain Injury Policy Institute and the California Foundation for Independent Living, advocate on behalf of Medi-Cal recipients, but have no Medi-Cal beneficiaries as members.  (See Vick Decl. ¶¶ 1-5; Yeager Decl. ¶ 3.)

Diana Bonta is the defendant in both suits.  She is sued in her official capacity as Director of the Department of Health Services.[4]

## II.  Standing

The question of plaintiffs' standing is the first of a set of interrelated issues relating to whether plaintiffs, or some of them, may assert a claim under § 1983.  Because standing affects the court's jurisdiction to go any further, it must be addressed first.  But the standing inquiry is not independent of the two

---

[3]  At least one of these, the AIDS Healthcare Foundation, is itself a Medi-Cal provider.  (Stidham Decl. ¶ 4.)  The Foundation operates a Medi-Cal managed care plan.  (Id. ¶ 5.)

[4]  Plaintiffs in CIV-S-03-2110 also name the Department of Health Services as a defendant.  However, the Department is immune from suit under the 11th Amendment and, therefore, must be dismissed, leaving Director Bonta as the sole defendant.  Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900 (1984).

additional questions that must be addressed before reaching the merits of the dispute: (1) does the Medicaid statute confer any rights on either Medi-Cal providers or recipients that may be enforced by a private right of action under 42 U.S.C. § 1983; and (2) if there is such a right, what is the substance of that right? In the sections that follow the standing analysis, the court concludes that only Medi-Cal recipients have a claim under § 1983, not providers, and that this claim extends only so far as the equal access to quality care provisions of Section 30(A). Further, in keeping with Ninth Circuit precedent, the court finds that the right guaranteed by Section 30(A) has a large procedural component: Medi-Cal recipients are entitled to a considered rate making decisional process in which equal access to quality care is evaluated in relation to provider costs and the proposed rate. The standing analysis presages these conclusions by focusing on beneficiary standing to advance the procedural component of the Section 30(A) entitlement.

Standing consists of two broad levels of analysis, both of which are implicated in this case. The most basic analysis involves whether plaintiffs satisfy the constitutional minimum requirements of injury-in-fact, causation, and redressability. Courts have also crafted various prudential standing doctrines, two of which, associational standing and third-party standing, are at issue here. The first question is whether Medi-Cal beneficiaries and providers have Article III standing to seek to enjoin the 5% rate cut. The second question is whether Medi-Cal

providers have third-party standing to assert the rights of Medi-Cal beneficiaries. The final standing issue is whether beneficiary and provider organizations, who make up most of the plaintiffs in these suits, have associational standing to bring suit on behalf of their respective members.

A. Article III Standing of Medi-Cal Beneficiaries and Providers

To comply with the requirements of Article III standing, a plaintiff must satisfy three elements: injury-in-fact, causation, and redressability. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992).

The Article III standing analysis in this case is relatively straightforward. Medi-Cal beneficiaries and providers will suffer concrete injury caused by the 5% cut if it is permitted to go into effect. The injury to providers is obvious. As to beneficiaries, plaintiffs have presented sufficient evidence showing that at least some Medi-Cal providers will cease participating in the Medi-Cal program altogether or will refuse to take on new Medi-Cal patients if rates are reduced by 5%.[5]

---

[5] For instance, one practice group that provided primary care and OB/GYN services for 1500 Medi-Cal fee-for-service patients will stop providing anything but OB/GYN services to those patients, and may discontinue even those services as well. (Polansky Supp. Decl. ¶ 4.) Another provider is one of the only dermatological practices in the Bay Area to treat Medi-Cal patients. (Geisse Decl. ¶ 6.) Appointments for Medi-Cal patients are already restricted to "children, emergencies, severe debilitating dermatologic conditions, and cancer victims." (Id.) After the rate reduction, this practice will have to stop taking most new Medi-Cal patients. (Id. ¶ 11.) Additionally, plaintiffs have presented statistical evidence that physician participation in Medi-Cal was low before the rate reduction.

(See, e.g., Mazer Decl. ¶ 9; Kuon Decl. ¶ 10.) This reduction in the number of providers in the program will adversely affect beneficiaries' equal access to medical care and, quite possibly, its quality.

Moreover, as to redressability, an injunction prohibiting the rate reduction at least until a proper study of reimbursement rates has been conducted would redress providers' and beneficiaries' impending injury. Under the relaxed redressability standards applicable in procedural standing cases,[6] plaintiffs need demonstrate only that proper consideration of

---

(Bindman Decl. Ex. A, p. 2.) All of this evidence tends to confirm the statements made in many declarations that reimbursement rates for many services are already set below providers' costs. (See, e.g., Yelamanchili Decl. ¶ 10; Coughlin Decl. ¶ 7.)

[6] Plaintiffs seek to vindicate what is in part a procedural right, the right to have the State of California consider certain factors when setting Medi-Cal reimbursement rates. See Orthopaedic Hosp., 103 F.3d at 1500; infra at 32-34. This is a "procedural right" in the sense that it is a "procedural requirement the disregard of which could impair a separate and concrete interest of" plaintiffs (i.e., Medi-Cal beneficiaries' interest in receiving equal access to medical care). Lujan, 504 U.S. at 572. In a case involving a procedural right, the standards of redressability and causation applied in normal standing cases are relaxed. See Laub v. U.S. Dep't of the Interior, 342 F.3d 1080, 1086-87 (9th Cir. 2003); Hall v. Norton, 266 F.3d 969, 975 (9th Cir. 2001); Lujan, 504 U.S. at 572 & n.7. Plaintiffs in a procedural standing case need not establish that, were the government to follow the proper procedures, its ultimate action would be different. Instead, plaintiffs in a procedural standing case need demonstrate only that the factors the government failed to consider could have an influence on the ultimate outcome. Laub, 342 F.3d at 1087; Hall, 266 F.3d at 977. Thus, in order to establish causation and redressability, plaintiffs in this case need demonstrate only that consideration of Medi-Cal providers' costs in relation to equal access to quality services could influence the reimbursement rates the State ultimately sets.

provider costs in setting Medi-Cal reimbursement rates could influence the ultimate level at which those rates are set. See Laub, 342 F.3d at 1087; Hall, 266 F.3d at 977. Plaintiffs have made this demonstration. Thus, both Medi-Cal providers and beneficiaries have Article III standing to pursue this case.

B. Third-Party Standing

In addition to advancing their own interests, the provider organization plaintiffs seek to assert the interests of their Medi-Cal beneficiary patients. To assert such third-party standing, the person or entity seeking to represent another: (1) must have suffered an injury-in-fact, (2) must have a close relationship with the third party, and (3) there must be "some hindrance" or a "genuine obstacle" to the third party's ability to assert its own interests. Powers v. Ohio, 499 U.S. 400, 410-411, 111 S.Ct. 1364 (1991); Singleton v. Wulff, 428 U.S. 106, 112-116, 96 S.Ct. 2868 (1976). All of these criteria are satisfied in this case.

Medi-Cal providers will suffer a concrete economic injury if the 5% cut in their reimbursement rate is implemented. Moreover, Medi-Cal providers have a sufficiently close relationship with their patients who are Medi-Cal beneficiaries to meet the second factor in the third-party standing analysis. Indeed, the providers are in a unique position to advance the interests of Medi-Cal beneficiaries, since it is they who can predict the effect of a reimbursement rate cut on the services they intend to provide. See, e.g., Singleton, 428 U.S. at 117 (explaining that

a patient cannot secure medical services without the aid of a doctor and that an impecunious patient cannot secure medical services without his or her doctor's being reimbursed by the government for the doctor's services).

Whether Medi-Cal beneficiaries face "some hindrance" or a "genuine obstacle" to their ability to assert their own rights is a closer question. Here, the obstacle Medi-Cal beneficiaries face is a lack of information about the effect of Medi-Cal reimbursement rates on providers in light of providers' costs and the further effect of a rate cut on the provision of services to Medi-Cal beneficiaries.[7] Providers are the ones who know the relationship of reimbursement to service and to their costs. As compared to beneficiaries, they are in a far better position to evaluate the State's decisional process and the data relied upon by the State in determining reimbursement rates. This informational hurdle is similar in kind to those found sufficient in Powers and Singleton to confer third-party standing, and it

---

[7] The Supreme Court has in the past recognized a lack of incentive in the form of "practical barriers to suit" because of "the small financial stake involved and the economic burdens of litigation" as an obstacle sufficient for third-party standing purposes. Powers, 499 U.S. at 414-415. Defendant points out that the Ninth Circuit has held that "[a] simple lack of motivation does not constitute a 'genuine obstacle' to asserting an interest." Viceroy Gold Corp. v. Aubry, 75 F.3d 482, 489 (9th Cir. 1996) (holding that an employer does not have third-party standing to challenge a labor statute on its employees' behalf simply because the "employees probably would not be motivated to assert their own interests because they lack a sufficient individual economic stake in the outcome"). There seems to be some tension between Powers and Viceroy Gold on this point, but it is not material to the "genuine obstacle" analysis in this case.

suffices, at least at this point in the litigation, to confer third-party standing on Medi-Cal providers to assert the interests of their patients who are Medi-Cal beneficiaries.

C. Associational Standing

In CIV-S-03-2336, all of the plaintiffs are organizations whose members are either Medi-Cal providers or Medi-Cal beneficiaries. Under Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434 (1977), an organization has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

1. Beneficiary Organizations

The only true beneficiary organization is the Disabled Rights Union.[8] It has about 400 members, the "vast majority" of whom are Medi-Cal beneficiaries.[9] (Edmon Decl. ¶ 3.) In light of

[8] Defendant argues that there is no evidence (outside of plaintiffs' affidavits) of the existence of this organization, in that there is no record of its registration with the California Secretary of State or the Attorney General. However, a supplemental declaration from Beverly Edmon, the director of the Disabled Rights Union, makes clear that the Disabled Rights Union is a bona fide organization that has been registered with the Secretary of State since 1981 as "an unincorporated nonprofit association." (Edmon Suppl. Decl. ¶ 3.)

[9] At the hearing on this motion, defendant also pointed out that Ms. Edmon is not herself a Medi-Cal beneficiary. This is irrelevant for purposes of determining whether the Disabled Rights Union has associational standing to assert its members'

its membership and purpose, the first two steps of the associational standing test are met: Medi-Cal beneficiaries would have standing to sue in their own right, and one of the purposes of the Disabled Rights Union is to help Medi-Cal recipients obtain access to Medi-Cal services. (Edmon Decl. ¶¶ 4, 6, 8.) The final requirement - whether the claim or relief requires individual members to participate - is also satisfied. As the Third Circuit recently pointed out in a case based on similar facts, "[t]he need for some individual participation . . . does not necessarily bar associational standing under this third criterion." Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc. ("PPS"), 280 F.3d 278, 283 (3d Cir. 2002). Here, plaintiffs seek only injunctive relief such that an individualized showing on damages will not be required. Moreover, whatever individualized showing may be made as to access and quality, a significant component of plaintiffs' claim is directed at the State's failure to follow a considered decisionmaking process as required by Orthopaedic Hospital. Evidence about what the State considered - or failed to consider - when it enacted the rate reduction will not require individualized proof by beneficiary members. See PPS, 280 F.3d at 286.

---

interests. Ms. Edmon's declarations state that the "vast majority" of the Disabled Rights Union's members are Medi-Cal beneficiaries.

2. Provider Organizations

The next question is whether the provider organizations that make up most of the plaintiffs in these suits have associational standing to assert both the direct interests of their Medi-Cal provider members and their members' third-party interest in protecting the rights of their Medi-Cal patients.

Medi-Cal providers have standing to sue in their own right to enjoin a reimbursement cut.[10] Less well-established is whether a provider organization may claim associational standing to assert the interests of beneficiaries, where association members have third-party standing on behalf of beneficiaries. In the most analogous case, the Third Circuit found that associational standing followed from the third party standing of association members. In that case an organization of psychiatrists was permitted to assert the interests of patients because its members' individually had third party standing to advance their patients' interests. See PPS, 280 F.3d at 291; Tacy F. Flint, A New Brand of Representational Standing, 70 U.Chi.L.Rev. 1037 (2003) (arguing that there is no constitutional impediment to combining associational and third party standing). The reasoning in PPS is persuasive. As to the second Hunt factor, there is no dispute that the interests of Medi-Cal providers and beneficiaries are germane to the purposes of these organizations.

[10] Defendant argues that Medi-Cal providers lack standing because they do not have a right to enforce 42 U.S.C. § 1396a(a)(30)(A) under 42 U.S.C. § 1983. (Def.'s Opp'n at 7-8.) This is not an argument about standing but about the merits of the providers' legal theory.

Finally, for the same reasons discussed above in the context of beneficiary organizations, individual participation by members is not necessary. Thus, the provider organizations here have standing to assert the interests of providers and beneficiaries alike.

III. Existence of an Enforceable Right Under 42 U.S.C. § 1983

The plaintiffs bring suit under 42 U.S.C. § 1983, which provides a remedy for persons who are deprived of "any rights, privileges, or immunities secured by the Constitution and laws." The Supreme Court has held that the phrase "and laws" permits persons to sue for the violation of rights secured to them by federal statute. See Maine v. Thiboutot, 448 U.S. 1, 4-8, 100 S.Ct. 2502 (1980). However, not all federal statutes create individual rights that can be enforced through § 1983. See Blessing v. Freestone, 520 U.S. 329, 340, 117 S.Ct. 1353 (1997). The Court has developed a three factor test to determine whether a federal statutory provision creates an enforceable right: (1) Congress must have intended that the provision benefit the plaintiff; (2) the right must not be so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the statute must unambiguously impose a binding obligation on the states. Id. at 340-41.

The Court recently clarified this test in Gonzaga University v. Doe, 536 U.S. 273, 283, 122 S.Ct. 2268 (2002). The plaintiff in Gonzaga brought suit under § 1983 to enforce a provision in the Family Educational Rights and Privacy Act (FERPA), which

limits the release of a student's educational records without permission. The Court found that FERPA does not confer an enforceable right because the language of the statute does not focus on the protected student, but rather on the Secretary and the educational institution, and is couched in terms of a "policy and practice" rather than any one individual's entitlement. Moreover, the Court found that the structure of the statute also suggests that Congress did not intend to create a right under § 1983 because the statute provides for an administrative remedy. In reaching its holding, the Court rejected the view that it is enough for a plaintiff to show membership in a group generally benefitted by a statute; rather, "[f]or a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted,'" not the person regulated or any aggregate group. Id. at 284. Thus, Gonzaga requires close attention to the wording and structure of a statute to determine whether Congress has created an individual entitlement that may give rise to a claim under section 1983.

There is an additional complication in applying the Gonzaga test to § 1396a of the Medicaid statute. In two identical statutes, Congress spoke directly, if opaquely, to the approach courts should use in determining whether Congress intended to create an enforceable right in different portions of the Social Security Act, including its Medicaid provisions. See 42 U.S.C. §§ 1320a-2 & 1320a-10. These statutes are identically worded, and the fact that there are two such statutes is probably a

mistake.[11] The statutes provide as follows:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 112 S.Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of this title is not enforceable in a private right of action. 42 U.S.C. § 1320a-2.

The two statutes were enacted in 1994 after the Court's decision in Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360 (1992).[12] The intended effect of the statutory language is at best uncertain because the reference to "any such grounds applied in [Suter], but not applied in prior Supreme Court decisions" is open to interpretation. However, "the fairest reading of Section 1320a-2 [and 1320a-10] is that Congress was concerned . . . that a court should not eviscerate an otherwise enforceable right merely because it appears in a statute mandating that participating states include a particular provision in their state plans." Messier v. Southbury Training School, 916 F.Supp. 133, 144-45 (D.Conn. 1996); see also Harris v. James, 127 F.3d 993, 1002-03 (11th Cir. 1997). But see LaShawn A. v. Barry, 69 F.3d 556, 568-

[11] See Pub. L. 103-382 (42 U.S.C. § 1320a-2); Pub. L. 103-432 (42 U.S.C. § 1320a-10).

[12] The Supreme Court did not consider the effect of this statute in Blessing, which dealt with Title IV-D of the Social Security Act. Blessing, 520 U.S. at 332.

70 (D.C. Cir. 1995), vacated by 87 F.3d 303 (1996) (holding that, because Suter did not use an approach different from past cases, §§ 1320a-2 & 1320a-10 are without any effect). In light of sections 1320a-2 and 1320a-10, when applying Gonzaga to the particular sections of the Medicaid Act at issue here, the court will not consider that an individual entitlement is absent simply because the wording of the statute is directed to the required contents of a state plan as opposed to the rights of a beneficiary or provider under a plan. Thus, provisions that require certain contents in state plans can create rights enforceable under § 1983, so long as they otherwise meet the test employed by the Court in Suter, Blessing and Gonzaga.[13]

A. Section 30(A)

Plaintiffs contend that Section 30(A) creates an individual right for both Medicaid providers and beneficiaries. They rely primarily on the Ninth Circuit's decision in Orthopaedic Hospital v. Belshe, 103 F.3d 1491 (9th Cir. 1997), and the Supreme Court's decision in Wilder v. Virginia Hospital Association, 496 U.S. 498, 110 S.Ct. 2510 (1990). In Orthopaedic Hospital, the Ninth Circuit held that a Medi-Cal rate reduction violated Section 30(A). 103 F.3d at 1496. The case was brought under § 1983 by a

---

[13] The court respectfully notes that Congress would give greater assistance to the courts, and retain its proper authority over an important policy and political question - when and by whom suit may be brought - by directly stating which provisions give rise to a claim under section 1983, and for whom, rather than commenting, in vague language, on particular approaches adopted by the Supreme Court to divine Congress' unexpressed intent.

provider hospital, and the district court had held that Section 30(A) creates an enforceable right for Medicaid providers.[14] (Bookman Decl. Ex. A, p. 7.)  However, this question was not addressed by the Ninth Circuit and apparently was not put in issue on appeal.  Since the question was not actually decided by the court, but only assumed, Orthopaedic is not binding on whether providers have an enforceable right under Section 30(A) and § 1983.  See Sorenson v. Mink, 239 F.3d 1140, 1149 (9th Cir. 2001) ("unstated assumptions on non-litigated issues are not precedential holdings"); Estate of Magnin v. Comm'r, 184 F.3d 1074, 1077 (9th Cir. 1999).

The plaintiffs' reliance upon the Supreme Court's decision in Wilder is similarly unavailing.  Wilder did not deal with

---

[14]  Plaintiffs contend that this holding of the district court precludes the defendant from arguing that Section 30(A) does not create an enforceable right.  (CMA's Mot. at 19-21.) The court, however, declines to find preclusion.  First, the district court's June 28, 1991 decision in Orthopaedic Hospital came before the Supreme Court's decisions in Suter, Blessing, and Gonzaga, which refined the enforceable rights analysis.  See Steen v. John Hancock Mut. Life Ins. Co., 106 F.3d 904, 914 (9th Cir. 1997) (holding that collateral estoppel does not apply when there is a "significant change in the legal climate").  Second, because of the unique position of the government in litigation, a state should not ordinarily be subjected to nonmutual offensive issue preclusion.  See United States v. Mendoza, 464 U.S. 154, 162-63, 104 S.Ct. 568 (1984) (holding that nonmutual offensive issue preclusion does not apply against federal government); Hercules Carriers, Inc. v. Claimant Fla., 768 F.2d 1558, 1577-1582 (11th Cir. 1985) (holding that nonmutual offensive issue preclusion is not available against the state government); Chambers v. Ohio Dep't of Human Servs., 145 F.3d 793, 801 n.14 (6th Cir. 1998) (holding that nonmutual issue preclusion should not apply against the state government); Helene Curtis, Inc. v. Assessment Appeals Bd., 76 Cal.App.4th 124, 133, 90 Cal.Rptr.2d 31 (1999) (holding that, as a matter of state law, nonmutual offensive issue preclusion does not apply against the state).

Section 30(A) but with another provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), the Boren Amendment, which subsequently has been repealed. 496 U.S. at 501. The Court in Wilder held that the Boren Amendment created an enforceable right for Medicaid providers. Id. The Boren Amendment required states to pay certain providers rates that "the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws." Id. at 503. Plaintiffs argue that the language of Section 30(A) is indistinguishable from the Boren Amendment.

Even assuming the continued vitality of Wilder after Gonzaga, the language of Section 30(A) is not the same as that of the Boren Amendment. Both the Fifth and the Third Circuits have so held. See Pa. Pharmacists Ass'n v. Houstoun, 283 F.3d 531, 538 (3d Cir. 2002) (en banc) ("The language of Section 30(A) contrasts sharply with that of the Boren Amendment. . . ."); Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908, 926-28 (5th Cir. 2000) ("However, in contrast to the Boren Amendment, section 30(A) does not create an individual entitlement in favor of any provider."). Gonzaga makes clear that a court must examine the specific statutory provision at issue in determining whether it creates an enforceable right. Thus, the question here is whether Section 30(A), not the repealed Boren Amendment, creates an enforceable right under the

standards announced in Gonzaga, as modified by 42 U.S.C. §§ 1320a-2 and 1320a-10.

1. Congressional Intent to Confer a Right

The first step under Gonzaga is to determine whether Congress unambiguously intended to create an enforceable right. Gonzaga, 536 U.S. at 280. The focus is on the text and structure of the statute. Id. at 284-86. As the Third Circuit has found, the efficiency and economy requirements of Section 30(A) are aimed at benefitting the State and preserving Medi-Cal/Medicaid funds. Pa. Pharmacists, 283 F.3d at 537. Neither requirement assists either providers or beneficiaries. Moreover, as both the Third and Fifth Circuits further found, quality and access do not benefit providers, but do directly benefit beneficiaries. Id.; Evergreen Presbyterian Ministries, 235 F.3d at 928-29. Further in favor of a claim by beneficiaries, the two requirements are not phrased in aggregate or indirect terms - such as requiring a general policy or requiring substantial compliance - that might suggest that no single beneficiary is entitled to quality care or equal access. Thus, the statutory language suggests that providers do not have an enforceable right under § 1983, but that beneficiaries do.

Admittedly, as to beneficiaries, the language of Section 30(A) is not the paragon of rights-creating language, like Title VI of the Civil Rights Act. However, the structure of § 1396a(a), as a list of requirements that a state plan must meet, largely prevented Congress from using the sort of "no person

shall" language cited by the Gonzaga Court. And it is precisely this structure -- a provision's inclusion as a requirement of a state plan -- that Congress, in §§ 1320a-2 and 1320a-10, directed the courts to ignore when determining whether the provision creates an enforceable right under § 1983. Moreover, it has been generally understood, even after Suter and Blessing, that Section 30(A) creates an enforceable right for recipients. See Pa. Pharmacists, 283 F.3d at 544 ("Medicaid recipients plainly satisfy the intended-to-benefit requirement and are thus potential private plaintiffs."); Evergreen Presbyterian Ministries, 235 F.3d at 928 ("[T]he recipient plaintiffs have an individual entitlement to the equal access guarantee of section 30(A)."). Finally, unlike the statute in Gonzaga, a Medi-Cal beneficiary can resort to no administrative procedure to seek quality care or equal access.

Such legislative history as there is also supports the conclusion that Congress intended a private enforcement action under section 1983 for beneficiaries but not for providers. When the Boren Amendment was repealed, the legislative history indicates a congressional intent to end provider suits. See H.R. Rep. No. 105-149, at 590 (1997) ("It is the Committee's intention that, following enactment of this Act, neither this nor any other provision of [42 U.S.C. § 1396a] will be interpreted as establishing a cause of action for hospitals and nursing facilities relative to the adequacy of the rates they receive."). Indeed, this was Congress' "dominant objective." Pa.

Pharmacists, 283 F.3d at 540 n.15. On the other hand, in passing certain 1981 amendments to section 30(A), Congress noted that "in instances where the States or the Secretary fail to observe these statutory requirements, the courts would be expected to take appropriate remedial action." H.R. Rep. No. 97-158, at 301 (1981). As the Third Circuit noted, this statement suggests that Congress intended that some class of plaintiffs, such as beneficiaries, would be able to enforce the terms of section 30(A) by private suit under § 1983.

The court holds that in Section 30(A) Congress created rights to quality care and equal access that may be enforced by Medicaid recipients under § 1983. However, the language of the statute does not unambiguously create such rights in Medicaid providers, given that economy, efficiency, quality, and equal access do not evince an intent to benefit providers. The focus of Section 30(A), and the Medicaid Act generally, is upon Medicaid recipients. Providers are benefitted only incidentally, not directly, and Gonzaga clarifies that simply receiving a benefit is not enough to demonstrate the intentional creation of an enforceable right. The two circuit courts to have considered the enforceability of Section 30(A) most recently both decided that Congress intended to create a right for Medicaid recipients but not providers. Pa. Pharmacists, 283 F.3d at 544; Evergreen Presbyterian Ministries, 235 F.3d at 928-29. The court follows these holdings and the reasoning of these decisions.

2. Vague and Ambiguous

The second factor in the enforceable rights analysis is whether the right at issue is too vague and ambiguous for judicial enforcement. As previously discussed, Section 30(A) is intended to create a right to both quality care and equal access. Equal access - access equivalent to privately insured persons in the same geographic area - is sufficiently definite for enforcement by courts. See, e.g., Evergreen Presbyterian Ministries, 235 F.3d at 930 (agreeing with "the many other courts that have addressed the equal access provision that it is not too vague and amorphous to be beyond the competence of the judiciary to enforce").

The term "quality of care" is less definite. Unlike the access language, there is no point of reference - for example, equal in quality to that received by the general population in the geographic area. However, the Ninth Circuit has already construed the term "quality of care" as meaning that rates must "bear a reasonable relationship to efficient and economical [providers'] costs." Orthopaedic Hosp., 103 F.3d at 1496. This formulation requires the State to consider providers' costs in setting rates. Given this construction, further discussed below, the right of recipients to quality care is not so vague and ambiguous that its enforcement would strain judicial competence.[15]

[15] The court expresses no opinion as to whether a claim to quality services would be judicially manageable where the issue were other than whether rates have been set in consideration of cost of service.

3. Binding Obligation

The final factor in the enforceable rights analysis is whether the statutory provision imposes a binding obligation on the states. Gonzaga, 536 U.S. at 282. The provision must be phrased in "mandatory, rather than precatory, terms." Id. (quoting Blessing, 520 U.S. at 340-41.). Although Medicaid is an optional program, once a state elects to participate, the contents of the state plan specified in § 1396a(a) are required, not optional. Section 30(A) uses only mandatory language. It imposes a binding obligation on any state that participates in the Medicaid program.

In sum, the quality and access provisions of Section 30(A) meet the Supreme Court's three factor test, as clarified in Gonzaga, for finding a statutory right enforceable through § 1983. However, this right extends only to recipients and not to providers.

B. Managed Care Provisions

There are two Medi-Cal managed care provisions that the plaintiffs claim create rights enforceable under § 1983: 42 U.S.C. §§ 1396b(m)(2)(A)(iii) and 1396n(b)(4). Section 1396b(m)(2)(A)(iii) requires states to pay "actuarially sound" rates to Medicaid managed care plans. Nothing in this provision benefits, or creates rights for, Medicaid recipients. By contracting with the State, the managed care plan must guarantee to provide services to recipients. (Pierson Decl. ¶ 3.) The actuarial soundness provision does not add anything that directly

benefits the recipients, such as requirements of quality care or equal access. Moreover, it is at least unclear that the actuarial soundness provision is intended to create a right for providers to a certain reimbursement rate. It is equally plausible that the section is intended to protect the State plan from overpayment.

The plaintiffs argue that the applicable regulation suggests that the term "actuarially sound" is intended to benefit providers. (CMA's Reply at 33.) However, even assuming that it is permissible to base a § 1983 right on a regulation,[16] the applicable regulation is itself far from clear:

> Actuarially sound capitation rates means capitation rates that--
>
> (A) Have been developed in accordance with generally accepted actuarial principles and practices;
>
> (B) Are appropriate for the populations to be covered, and the services to be furnished under the contract; and
>
> (C) Have been certified, as meeting the requirements of this paragraph (c), by actuaries who meet the qualification standards established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board. 42 C.F.R. § 438.6(c)(1)(I).

Plaintiffs argue that the requirement that the rates be

---

[16] Whether federal regulations can create rights enforceable under § 1983 is not at all clear. However, there are good reasons to think that they cannot. <u>See</u> <u>Wright v. City of Roanoke Redev. & Hous. Auth.</u>, 479 U.S. 418, 437-38, 107 S.Ct. 766 (1987) (O'Connor, J., dissenting) (noting concerns with allowing regulations to create enforceable rights); <u>S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.</u>, 274 F.3d 771, 790 (3d Cir. 2001) (holding that regulations do not create enforceable rights when they are too far removed from congressional intent).

"appropriate for the populations to be covered, and the services to be furnished under the contract" is intended to create a right to a minimum payment level for providers. (CMA's Reply at 33.) But plaintiffs read too much into the word "appropriate." The plain meaning of this regulation is that to be "actuarially sound" a rate must be based on the demographics of the area to be served and the services provided there. Nothing in this concept requires any particular level of reimbursement or consideration of provider costs. In light of Gonzaga, this language is too oblique to create an enforceable right under § 1983 for providers.

The second managed care provision at issue, § 1396n(b)(4), states that:

> The Secretary, to the extent he finds it to be cost-effective and efficient and not inconsistent with the purposes of this subchapter, may waive such requirements of section 1396a of this title . . . as may be necessary for a State– . . . (4) to restrict the provider from (or through) whom an individual (eligible for medical assistance under this subchapter) can obtain services (other than in emergency circumstances) to providers or practitioners who undertake to provide such services and who meet, accept, and comply with the reimbursement, quality, and utilization standards under the State plan, which standards shall be consistent with the requirements of section 1396r-4 of this title and are consistent with access, quality, and efficient and economic provision of covered care and services, if such restriction does not discriminate among classes of providers on grounds unrelated to their demonstrated effectiveness and efficiency in providing those services and if providers under such restriction are paid on a timely basis in the same manner as health care practitioners must be paid under section 1396a(a)(37)(A) of this title. 42 U.S.C. § 1396n(b)(4).

The convoluted grammar of this section defeats authoritative

interpretation.  But unlike Section 30(A), § 1396n(b)(4) does not directly confer a right to equal access to quality care upon Medi-Cal beneficiaries.  Rather, the section permits the following sequence:

1.   The Secretary in his guided discretion ("to the extent he finds it to be cost-effective and efficient and not inconsistent with the purposes" of Medicaid);

2.   May waive other requirements of § 1396a and grant permission to a state to create managed care programs that restrict beneficiaries to certain managed care providers;

3.   If the providers agree to comply with the state plan, including the requirements of "access, quality, and efficient and economic provision" of services.

The apparent intention of this provision is not to benefit Medi-Cal recipients, who would otherwise have a greater degree of choice of providers under the fee-for-service system, but to benefit the state plan by providing a possibly more cost-effective way to provide medical services.

Furthermore, this provision, and managed care in general, inserts the managed care plan as an intermediary between the patient-recipient and the practitioner-providers.  In the fee-for-service context, it is the State itself that is obligated to provide access to quality services to Medi-Cal beneficiaries.  In the managed care system, it is the managed care plan that assumes, by its contract with the State, the obligation of providing access and quality services to beneficiaries.  The two

examples of plan contracts in the record contain quite detailed

provisions relating to the quality of services and the managed

care plan's duty to provide access to those services.[17]   (See

Pierson Decl. Exs. 1 & 2.)   If the managed care plan fails to

provide required services, then there are internal grievance

procedures for plan members, and the State may also take action

against the provider for failing to adhere to its contract. (Id.

Ex. 1, pp. 8-34, 8-36.)   Under the contract, whatever the

capitation rates paid to the managed care provider, the duties

owed by the provider do not vary.   For example, the managed care

plans are specifically bound by contract to "maintain adequate

numbers and types of specialists within the network."   (Id., p.

7-4.)   If a plan causes too many of its specialists to stop

seeing Medi-Cal patients, by passing along the full capitation

rate reduction to its doctors, then the plan will be in breach of

its contract with the State.   If a beneficiary plan member is

denied needed medical treatment because the plan has failed to

enroll specialists, then the beneficiary may initiate an

administrative proceeding.   If the managed care plan defaults

because of the capitation rate, then Medi-Cal beneficiaries will

be eligible for regular fee-for-service coverage.   In sum, §

1396n(b)(4) is directed toward the relationship between the State

and the managed care plan, has little direct effect upon the

---

[17]   For example, the Health Net of California plan contract
requires Health Net to maintain a network of primary care
physicians, who are located within thirty minutes or ten miles of
beneficiaries' residences.   (Pierson Decl. Ex. 2, Exhibit A,
Attachment 6.8.)

services made available to beneficiaries, and does not provide a standard by which capitation rates can be evaluated.   Under Gonzaga, beneficiaries are too indirectly benefitted, if at all, by § 1396n(b)(4) to assert a right enforceable under § 1983.

Section 1396n(b)(4) also fails to create any right for the managed care plans themselves.   The quality and access language does not benefit the plan.   Moreover, the managed care plan's relationship with the State is contractual.   If the State has breached its contract by lowering the payment to the plan, then the plan's remedy is a breach of contract action in state court. If the contract allows the State to reduce rates in this manner, then that is a risk assumed by the plan.   Section 1396n(b)(4) affords no rights to managed care providers in their dealings with the State.

## IV.   The Scope of Plaintiffs' Rights

Having decided that the beneficiary plaintiffs who are not in managed care plans have rights to equal access and quality care enforceable under § 1983, the court must determine the scope of those rights.   In doing so, the court is guided by the Ninth Circuit's decision in Orthopaedic Hospital.   In Orthopaedic Hospital, plaintiff challenged adjustments to reimbursement rates for several procedures and services.   Orthopaedic Hosp., 103 F.3d at 1494.   The court held that Section 30(A) requires the State "to consider the costs of providing. . . services" and that reimbursement rates "should bear a reasonable relationship to an efficient and economical [provider's] costs of providing quality

care." Id. at 1500. The court reviewed the State's rate setting under an arbitrary and capricious standard.[18]

The Orthopaedic Hospital rule is mostly procedural - the state agency must consider the proper factors in developing a reimbursement rate. Because costs were not considered by the State, the court did not reach the further question of whether the resulting rate was appropriate under Section 30(A).

The Ninth Circuit's approach has substantial practical benefits. The Medicaid Act is clearly intended to give states discretion and flexibility in setting reimbursement rates, within the limits of federal law. See Evergreen Presbyterian Ministries, 235 F.3d at 361 n.12; Children's Hosp. and Health Ctr. v. Belshe, 188 F.3d 1090, 1103 (9th Cir. 1999). The arbitrary and capricious standard limits the court's review of the State's rate setting and permits the court to defer to the

---

[18] The arbitrary and capricious standard is normally used to review federal administrative action under the Administrative Procedure Act, but that act does not address review of state actions. Dep't of Transp. & Dev. of La. v. Beaird-Poulan, Inc., 449 U.S. 971, 973, 101 S.Ct. 383 (1980) ("the APA is of course not applicable to state agencies"). However, most courts have used this standard to review state agency rate setting under Medicaid. See Ark. Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 529-30 (8th Cir. 1993) (reviewing compliance with Section 30(A) under arbitrary and capricious standard); Concourse Rehab. & Nursing Ctr. Inc. v. Whalen, 249 F.3d 136, 145 (2d Cir. 2001) (reviewing compliance with Boren Amendment under arbitrary and capricious standard); Lett v. Magnant, 965 F.2d 251, 257 (7th Cir. 1992) (Boren Amendment); AMISUB (PSL), Inc. v. Colo. Dep't of Soc. Servs., 879 F.2d 789, 799-800 (10th Cir. 1989) (Boren Amendment); see Wilder, 496 U.S. at 520 n.18 (noting that "the Courts of Appeals generally agree that . . . a federal court employs a deferential standard of review" in reviewing state Medicaid rate setting).

judgment of specialists in a complex regulatory field. Envtl. Def. Ctr., Inc. v. U.S. EPA, 344 F.3d 832, 858 n.36 (9th Cir. 2003). Furthermore, it is fair to assume that a rate that is set arbitrarily, without reference to the Section 30(A) requirements, is unlikely to meet the equal access and quality requirements. Thus, a beneficiary plaintiff may insist that the State, at a minimum, consider the effect of a rate reduction on equal access to quality services in light of provider costs.[19] Orthopaedic Hosp., 103 F.3d at 1500.

## V. Preliminary Injunction Standard

The traditional factors for granting a preliminary injunction are: (1) a strong likelihood of success on the merits; (2) irreparable injury; (3) a balance of hardships in the movant's favor; and (4) the public interest (in cases affecting it). See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1200 (9th Cir. 1980). The moving party can meet its burden by making "a clear showing of either (1) a combination of probable success on the merits and a possibility of irreparable injury, or (2) that its claims raise serious

---

[19] In general, the Director's approach to Orthopaedic Hospital in this litigation has been puzzling. The defendant has argued extensively in briefs and at argument that Orthopaedic was wrongly decided, even stating at one point that its "holding must be overturned." (Def.'s Supp. Brief at 2.) The defendant has attempted to convince the court that it simply cannot comply with Orthopaedic Hospital's requirement of conducting cost studies, declaring that "Orthopaedic is an example of the impractical and unreasonable requirement of relying upon cost studies as a basis for rate setting." (Opp'n to CMA's Mot. at 27.) If the defendant wishes to argue the impracticality or invalidity of Orthopaedic Hospital, she must do so before the Ninth Circuit.

questions as to the merits and that the balance of hardships tips in its favor." Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 881 (9th Cir. 2003). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Taylor By and Through Taylor v. Honig, 910 F.2d 627, 631 (9th Cir. 1990).

A. Irreparable Injury

An irreparable injury is one that cannot be adequately redressed by a legal or equitable remedy following trial. Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992). Plaintiffs come forward with adequate evidence that the rate reduction has a likelihood of reducing the recipient plaintiffs' access to medical services, including services by pharmacists.[20] (See supra note 5.) Medi-Cal recipients who must wait until after trial to receive appropriate services may well sustain irreparable injury, whether in pain suffered or irremediable worsening of a condition. A future permanent injunction after a full trial is not an adequate remedy for someone who has been denied necessary medical care in the interim.

---

[20] Both plaintiffs and defendant make evidentiary objections to each others' submissions. The objections either lack merit or do not affect the court's overall assessment of the record. See also Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) (holding that court can consider inadmissible evidence in the context of a motion for preliminary injunction).

Defendant argues that there is too much uncertainty surrounding the impact of the 5% rate reduction to support plaintiffs' claim of irreparable injury. (Opp'n to CMA's Mot. at 28.) But plaintiffs have produced evidence of serious access problems even under the current rates. (See, e.g., Anaya, Sr. Decl. ¶¶ 4-6; Anaya, Jr. Decl. ¶¶ 4-6; Geisse Decl. ¶¶ 5-6, 11; Low Decl. ¶¶ 7-8.) Plaintiffs have also produced evidence of providers who will stop taking new Medi-Cal patients or stop serving Medi-Cal patients altogether if the rate reduction is implemented. (See, e.g., Polansky Decl. ¶¶ 4-6; Germano Decl. ¶¶ 3-6; Geisse Decl. ¶ 11.) Given plaintiffs' high likelihood of success on the merits, discussed below, this evidence of irreparable injury is sufficient to support a preliminary injunction.

B. Likelihood of Success on the Merits

Section 30(A) requires the State to consider quality and access when setting Medi-Cal reimbursement rates. In order to properly consider quality and access, the State must consider what it costs providers to perform the various services and procedures. Orthopaedic Hosp., 103 F.3d at 1500.

The State's purpose in enacting the rate reduction was to reduce the budget deficit. The statute declares on its face that the rate reduction is "[d]ue to the significant state budget deficit projected for the 2003-04 fiscal year." Cal. Welf. & Inst. Code § 14105.19(a). While the State certainly is entitled to conserve funds, the defendant has produced no evidence that

the State legislature based the rate reduction on evidence that the reduction could be sustained by providers, in light of their costs, without a loss of quality or equal access for Medi-Cal recipients. Indeed, what little evidence there was before the State legislature suggested that a rate reduction might be inconsistent with quality and access. For example, the Legislative Analyst's report on the original proposed 15% rate reduction states that California's reimbursement rates, when adjusted for cost-of-living, are among the ten lowest in the country. (Campbell Decl. Ex. D, p. 16.) The report warns that a rate reduction could negatively affect access to services. (Id., pp. 14-16.) Finally, the report declares that California has "no rational basis for [its] rate system" which can lead to "overpayments for some medical procedures and underpayments for others."[21] (Id., p. 16.)

The defendant argues that the State legislature's initial rejection of the 15% rate cut shows that it did consider the relevant factors in enacting the lower cut. (Opp'n to CMA's Mot. at 22-24.) The defendant cites an Assembly subcommittee agenda that directed certain inquiries to the Department of Health

---

[21] In 2001, the Legislative Analyst produced a report entitled A More Rational Approach to Setting Medi-Cal Physician Rates. Elizabeth Hill, A More Rational Approach to Setting Medi-Cal Physician Rates, available at http://www.lao.ca.gov/2001/020101_medi-cal_rates.pdf. The report is critical of the Department of Health Services for not conducting regular, periodic rate reviews to ensure the consistency of rates with access to quality medical care. It also argues that the rate adjustments the Department has made over the years have not been based upon any assessment of recipients' access. Id. at 1-4.

Services. (Campbell Decl., Ex. C.) The agenda does show that the Assembly was concerned about "the impact of such a significant rate reduction on the availability of providers." (Id., p. 5.) However, there is no evidence of any response from the Department to the committee's inquiries that could now support a 5% cut.

In CIV-S-03-2110, which is focused solely on pharmacy services, the defendant argues that the State has met the Orthopaedic Hospital standard because the rates it pays are based on a pharmacy's acquisition costs. (Def.'s Suppl. Brief After Hearing at 5-6.) The evidence does show that reimbursement rates for prescription drugs are based upon a formula that includes the acquisition costs of drugs. (Hillbloom Decl. ¶¶ 5-8.) However, there is no evidence that the State legislature had any evidence about the consistency of the rate cut with access to quality pharmacy services.[22]

Under the standard of Orthopaedic Hospital, the plaintiffs demonstrate a high likelihood of success on the merits. There is no evidence that the State considered the relevant factors when it enacted the rate reduction. Budget constraints are not alone a valid justification for rate setting. See Ark. Med. Soc'y, Inc., 6 F.3d at 531 ("Abundant persuasive precedent supports the

---

[22] The defendant has produced some evidence to show that pharmacies' costs will continue to be met after the 5% rate reduction. (Def.'s Suppl. Brief at 6-7.) If so, the record suggest that this outcome is by luck, not design. Nonetheless, there is no evidence that the State considered the possible effect on beneficiaries' access to pharmacist services.

proposition that budgetary considerations cannot be the conclusive factor in decisions regarding Medicaid."); Orthopaedic Hosp., 103 F.3d at 1499 n.3; AMISUB, 879 F.2d at 800-01.

C. Public Interest and the Balance of Hardships

In deciding to grant an injunction, a court must consider the balance of hardships and, in a case such as this, the public interest. The defendant argues that the court should refrain from issuing a preliminary injunction because of the State's "unprecedented budget deficit." (Opp'n to CMA's Mot. at 43.) The defendant maintains that the State was faced with very difficult choices and made the best decision that it could. (Id.) For example, the defendant points out that instead of reducing rates across the board, "the state could have chosen to eliminate certain optional benefits such as prescription drugs for adults," but that this would be a harsh result (Id.)

The court is mindful of the difficult position facing California. However, the terms of the State's participation in Medicaid do not permit it to continue to receive federal monies while violating the requirements of the statute, even for a good purpose, such as maintaining optional benefits. As long as the State wishes to be a part of the Medicaid program, it must meet the requirements of the Medicaid Act.

The court also notes that this injunction does not leave the State without options for reducing its Medicaid expenditures. First, after proper study and consideration of the relevant factors, the defendant may be able to show that a reduced

reimbursement rate in some medical services is not arbitrary but in fact is consistent with quality care and equal access. Second, there are other ways the State can save money within the Medi-Cal program. The Legislative Analyst has recommended several alternatives to an across-the-board rate reduction including expanding the medical case management program, increasing copayments for non-essential services, increasing competition for the State's managed care contracts, and expanding managed care enrollment among the elderly and disabled. (Campbell Decl. Ex. D, pp. 18, 20, 24, 25.) The State also chooses to provide Medi-Cal recipients with a number of services not required by federal law. An earlier proposal called for eliminating 18 of the 34 offered optional benefits, which would have saved the State approximately $360 million. (Id. Ex. C, p. 6.) While all of these "optional" services are obviously important to the recipients, the State does have the authority to drop optional services to reduce costs. What the State cannot do under the statutory terms of its participation in Medicaid is to elect to provide a service but then fail to fund it such that Medi-Cal recipients receive less than equal access to quality care for that service.

Given that the State has other options available to it and that plaintiffs are likely to succeed on the merits of their claim, the court finds that the public interest does not weigh against issuance of a preliminary injunction.

VI. Conclusion

Because the State failed to consider the effect of a rate reduction on beneficiaries' equal access to quality medical services, in view of provider costs, the pending rate reduction is arbitrary and cannot stand. Defendant Bonta is enjoined from implementing the 5% reimbursement rate reduction required by Welfare and Institutions Code § 14105.19 pending further proceedings in this court. This injunction does not apply to § 14105.19(b)(3), which reduces capitation rates paid to managed care plans by the actuarial equivalent of 5%. The injunction also does not apply to § 14105.19(b)(2), which reduces payments made in certain non-Medi-Cal programs.

The Department of Health Services is dismissed from CIV-S-03-2110 on the basis of 11th Amendment immunity.

IT IS SO ORDERED.

Dated: 23 December 2003.

DAVID F. LEVI
United States District Judge

ljr

United States District Court
for the
Eastern District of California
December 23, 2003

* * CERTIFICATE OF SERVICE * *

2:03-cv-02110
2:03-cv-02336

Clayworth

v.

Bonta

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on December 23, 2003, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Lynn S Carman
Law Offices of Lynn S Carman
1035 Cresta Way
Suite 3
San Rafael, CA 94903

HV/DFL

Irene K Tamura
Attorney General's Office for the State of California
PO Box 944255
Sacramento, CA 94244-2550

Craig J Cannizzo
Hooper Lundy and Bookman Incorporated
180 Montgomery Street
Suite 1000
San Francisco, CA 94104

Jack L. Wagner, Clerk

BY: ______________________
Deputy Clerk